On the docket is 11-20 Petter Packaging v. Hutchcraft. Mr. Nester here, Director of City Council. May it please the Court, my name is Michael Nester and I represent Petter Packaging Company. I'm here today to discuss a case that's been brought before the Court this morning. As an aside and before I begin the substance of my argument, as I was driving down this morning, I of course was thinking of my argument and more specifically what I was going to say to the Court to persuade the Court that my client should prevail. For some reason, the adage, I think it's Shakespearean, came into my mind and to be quite honest with you, I still can't rid my mind of it, but the adage was, brevity is the soul of wit. As the Court knows, I'm not very witty, so I'm not going to attempt to do so this morning. However, I will attempt to be brief. With regard to brevity in the context of this case, I want to suggest to the Court that the issues in this case are clear and concise, perhaps even simple. Not simple in the pejorative sense, but simple in the sense that they are straightforward, without nuance and without subtlety. And perhaps, and I apologize if I've done this, but perhaps in the briefing that I read last night with the motion to dismiss and the motion to strike, the Court might be of the opinion that this is a more complex case or complicated case than it actually is. In my view, Your Honors, I believe that there are three issues that the Court must address in deciding this case, and those issues are as follows. One, what law applies. Two, the law pertaining to fiduciary duties. And three, the law pertaining to covenants. With regard to the first issue, that is to say, the law applicable to this case, I believe it is clear, and I think we've staked out in our brief, that Kentucky law applies. And the reason why I believe that to be so is because both the asset purchase agreement and the employment agreement specify that Kentucky law will control relationships between the parties, that is to say, Petter, my client, and Hutchcraft, the defendant. I'm not certain that Hutchcraft, Mr. Hutchcraft, agrees with that proposition because in reading his briefs, he meanders from Illinois law to Kentucky law and back to Illinois law. But if he agrees, then there's no contest with regard to that issue. If there is disagreement, I again insist that Kentucky law applies. But if the Court disagrees with me, I would humbly suggest that there is no substantive or material difference between Illinois law and Kentucky law with regard to the issues in this case. When does the plaintiff think that the defendant violated the covenant? What point in time? When did that occur? When we first became aware of the violation, Your Honor, was in November of 2010. And we promptly filed with the Court a number of pleadings, including a petition for temporary restraining order, a petition for preliminary injunction, and a complaint for compensatory damages. So that's when the defendant allegedly violated the covenant not to compete? Well, we learned, Your Honor, that he had been violating the covenant not to compete prior to November.  When do you think he violated it? Not when the plaintiff became aware of it. When was it violated? Your Honor, I'm not certain that I can answer that with any degree of precision because we are in the preliminary injunction stage. There hasn't been significant discovery. But obviously months before November of 2010 was that violation. Was it after 2007? Yes. Okay. At this point in time, knowing what I know, without benefit of discovery, I would suggest that the Court's interpretation is correct. I would also suggest, Your Honor, that the Court is perhaps grappling with a five-year period. And in my view, the case law, both in Kentucky and Illinois, would suggest that that's not a substantive issue which would cause any concern with regard to either the breach of fiduciary duty claim or the breach of covenant not to compete claim. And I can explain that later on in the report. Mr. Nestor, if you could just speak up a little bit louder. The air conditioning is going. I'm having a little trouble hearing you. I apologize, Your Honor. With regard to the breach of fiduciary duty claim, I don't believe that there is any compelling evidence that suggests that there was not a fiduciary relationship existing between Petter, my client, and Hutchcraft, the defendant in this case. And I say that because the two factual relationships that existed between the parties, one is the asset purchase agreement, which required my client to pay Mr. Hutchcraft, who was in the packaging business, the same business that Petter Packaging is in, $700,000 for his business. And in conjunction with that, there was an employment agreement that was entered into at the same time, which provided that Mr. Hutchcraft would serve in the capacity of president of that company, carrying out his duties with regard to the packaging business, being paid in excess of $100,000 in salary, bonus, and commission per year. And those elements in and of themselves, I believe, establish a fiduciary relationship because he is in a capacity as an officer of the corporation, president of the corporation. He owes his highest unfettered duty to Petter Packaging. In addition to that, there was an evidentiary hearing in this case, and Mr. Hutchcraft admitted or conceded at that hearing that he had a duty of undivided loyalty, and those were his words, undivided loyalty to Petter. And then finally, as the Court is aware, there is a number of cases cited in the briefs  but to cite one case, the Levy case, individuals who control corporations owe a fiduciary duty to their corporation, including a duty to exercise the utmost good faith and honesty in all dealings and transactions. So I believe that it's undisputed that there was a fiduciary duty. As a result of that fiduciary duty, the corporate opportunity doctrine comes into play, and the corporate opportunity doctrine is a doctrine which basically states that a corporation's fiduciary is prohibited from taking advantage of a business opportunity which are considered as belonging to the corporation. And I'm now paraphrasing for a number of cases. If the corporate opportunity doctrine is to possess any vitality, the corporation must be given the opportunity to decide upon full disclosure of the pertinent facts whether it wishes to enter into a business that is reasonably incident to its present or prospective operations. Now, against that background of the law pertaining to this case, I want the Court to take time to examine the testimony of Mr. Hutchcraft as well as the testimony of my client, Mr. Searcy. There is no doubt that the customer at issue, FG Quality, was a customer of Pedder Packaging. And in addition, there is no dispute that the initial contact with FG Quality by Hutchcraft was a result of his position as president of Pedder. There is no dispute that the meeting between Hutchcraft and FG Quality was a business opportunity in which they were going to discuss Pedder Packaging. Hutchcraft never informed Pedder of this business opportunity. He never informed Pedder that he was thinking about or intended to conduct business with FG Quality on the side or off the books for his own benefit. He never informed Pedder that he was actually conducting that business. And later on in the briefs and the testimony, it's demonstrated that we believe that Mr. Hutchcraft conducted business accounting for approximately $270,000. And by the way, during the cross-examination of Mr. Hutchcraft, he did not deny that figure, so it's a substantive and significant amount. And so through or by his admissions, he's conceded that he's violated the corporate opportunity doctrine. And if you violate the corporate opportunity doctrine, you've breached your fiduciary duty, and thus a breach of fiduciary claim has been established. Somehow, someway, and I still cannot explain it, it's still somewhat perplexing to me, Judge McGlynn came to the conclusion. I don't think he came to the conclusion that there wasn't a fiduciary duty. I think he came to the conclusion that fiduciary duty was not breached. But I don't understand how he came to that conclusion under the facts of this case on the record before this Court. In addition, I would suggest to this Court that with regard to that breach of fiduciary duty, there is at a minimum evidence to indicate that Judge McGlynn's decision was against the manifest weight of the evidence. I believe that there is sufficient, competent evidence to demonstrate that he abused his discretion in reaching his decision. So whatever standard the Court employs in this regard, I believe that we have met that standard. So it is our position that the breach of fiduciary duty alone, in and of itself, independent of anything else that we've alleged, establishes a right for injunctive relief, which Judge McGlynn denied. The second independent issue is the covenant not to compete. And there are two elements or two provisions in the covenant not to compete that I would call to the Court's attention. One is the non-competition provision, and the other is the non-interference with business provision. Both are contained in the covenant not to compete. And by the way, the covenant not to compete is referenced in both the asset purchase agreement and the appointment agreement. So it was an integral part of this transaction, and those transactions are complementary in nature. So it was envisioned when Petter purchased Hutchcraft's business that Hutchcraft was going to become the president of the surviving company. And he did so, and he did it in that capacity for eight years. In this case, the defendant has resisted the imposition of liability with regard to the non-competition provision and the non-interference with business provision, which also could be referred to as a non-solicitation provision, by insisting that the contract had expired after five years and that there was a new contract and that under the new contract there was insufficient consideration for a new covenant not to compete. That is still to its essence its defendant's position, I believe. That position is without merit. The employment agreement itself reflects that the parties presently anticipate that the employment relationship may continue beyond the time of the original term. And in fact, that's what transpired. The contract relation did continue, was extended. There was no interruption. There was no abatement. There was no modification in terms. Mr. Hutchcraft continued as president, receiving in excess of $100,000 a year. There was no oral contract? There was just the one initial written? There was no new contract. Okay. And no new agreement, no oral contract subsequent to the written agreement, the employment agreement. That was simply extended or continued. And the best evidence of that is the continued performance by the parties of that agreement. Because there was no interruption, as I said, no change or modification. And they continued forward, unabated, until Mr. Hutchcraft was terminated in November of 2010 because it was only at that point in time that Petter found out or discovered that he had reached his fiduciary duty and he failed to honor the covenant not to compete. So the record would reflect that at the end of the five-year written agreement, he continued in the same position, was paid the same salary for his services, everything is the same. There is no discrepancy, Your Honor, whatsoever that from day one he was president of Petter Packaging and continued in that position until the day of termination. Did I understand you to say there was language in the employment agreement that would point to an extension of this past five-year period? Your Honor, the provision that I was referring to earlier in my remarks, the employment agreement, Section 4, the last sentence reads, and I'm quoting, quote, the parties presently anticipate that the employment relationship may continue beyond the original term, close quote. And I'm suggesting to the Court that's exactly what transpired in this case. So there's no need to examine this as a new contract, and there's no need to raise this issue of Latin consideration. I understand why Mr. Hutchcraft has done so. He's created, well, in fact, he's using a literary or legal device of, I think it's under Latin, but for individuals like myself who grew up in East St. Louis, it's a straw man, okay? He's created a straw man, and the straw man is you must have a new contract. And under the terms of the new contract, you need consideration. And he acknowledges that consideration for the employment agreement is the salary and the bonuses and commissions that he's being paid. But he said, aha, there is no consideration for the covenant not to compete, and therefore since there is no consideration, there is no covenant, therefore there cannot be a violation of the covenant. That's the straw man that he's created. But as I've indicated, there was no new contract, and therefore there's no need to examine this issue of consideration. Based upon the language that you just pointed out and the Louisville v. Bach case that you cited in there. Yes? Yes, Your Honor. Having said that, he then acknowledges that in Kentucky, in Illinois as well, he has a problem, and the problem is there's cases that stand for the proposition that continued employment can serve as consideration for a covenant not to compete. And so if continued employment, which Mr. Hutchcraft was engaged in, and we have a better package, constitutes consideration, then his argument fails. So then in an attempt to reinvigorate the straw man, he creates another issue, which is a fiction in my view, and that is, he says, well, under Kentucky law, if you have a continuation of the employment agreement, and if that serves as consideration for the covenant not to compete, it only serves as consideration for the covenant not to compete if the employee resigns. However, if the employee is fired or terminated by the employer, then the consideration fails, and you don't have a covenant not to compete. There are so many problems with that analysis, it's difficult to get my hands around or arms around, but just to suggest a few. One is, Kentucky law doesn't stand for that proposition. If the court looks at one of the cases that defendants have trumpeted with regard to this issue, the Central Adjustment Bureau case, they say it stands for the proposition that I just set forth for the court of syllogism, that I just set forth for the court, in the Central Adjustment Bureau case, which defendants cite for that proposition, the court said, quote, we express no opinion, however, as to the result we would reach had CBA terminated these individuals' employment, close quote. So that issue wasn't even addressed in CBA, and they admit that. Another case that defendants cite is Higdon, and Higdon does not give them any solace either, because Higdon says, and I quote, the hiring was the consideration running from Higdon, and it supports all of the obligations accepted by Walker. Even if it could have been terminated unilaterally at the unfettered will of the employer, it was nonetheless a contract under which rights and obligations existed prior to its termination, and for breach of which there is remedy at law, close quote. So the cases that defendants cite don't support the proposition that he has enunciated for this court. In addition, it just doesn't make sense. If you have a law that permits the employee to violate his contract so that he gains an advantage, in other words, you're going to have a lot of mischief. But in other words, what transpires is this. If the risk consideration for the covenant would be because of the continued employment, and if that covenant not to compete is terminable because of the failure of consideration when the employer terminates or fires or discharges the employee, the employee now has an incentive to violate the terms of his employment contract. Because he goes and he violates the terms, then the covenant not to compete cannot be enforced. Thank you, counsel. May it please the Court. I'm Jay Hutch. I represent the defendants in this case. And I listened very carefully to the questions that were asked. And I want to address a couple of key issues here. One is the employment agreement. And, Your Honor, you asked about the terms of the contract. Mr. Nestor read one sentence, which is under Section 4 of the employment agreement, but he didn't read the sentence before, or the one before that. And the one immediately before the sentence he read specifically provided dates. This contract will run from December 1, 2002. It shall continue through November 30, 2007, unless it is terminated pursuant to a provision. And this agreement shall not give employees any rights, any enforceable right to employment beyond this term. And then it talks about the parties presently anticipate that the employment relationship, not this employment agreement, the employment relationship may continue beyond the term. And when you look at the covenant not to compete, it references the employment agreement. And every time it references it, it capitalizes the word employment, capitalizes the word agreement. And it ties in the term of the covenant not to compete with the running of the employment agreement, not an employment relationship. Mr. Petter, when he drafted the employment agreement, made darn sure that this agreement would terminate November 30, that my client would have no rights under those beyond that date, but that he anticipated there might be another relationship or an employment relationship that may continue. But that covenant not to compete never references to an employment relationship. It's always to this particular employment agreement, which ran out of time. What changed after the date in the contract that expired in the relationship between your client and the… I'll acknowledge that basically life continued as far as how Mr. Petter handled his job. Did anything at all change in the relationship? No, nothing really changed. There was no new contract drafted. There was no discussion of a new contract. There was never any discussion of a new covenant not to compete. And there was never any consideration for a new covenant not to compete. There was consideration for continued employment. As Mr. Nestor stated, he got compensation. He got benefits. We would argue that there was no consideration for a new covenant not to compete and that this covenant, by its language, specifically went back to an employment agreement that had expired in November of 2007. And under that agreement, the period of the noncompetition would run either two years or three years. Was there an oral contract? I would suggest if it's not written it was oral that there was no further discussion. So you're not claiming that there was an oral contract between the parties? No. Okay. Life just continued. Okay. Okay. Now, the court, in this case, procedurally, or basically for oral orders, December 6th, which is not an order being appealed before this court, made two particular findings. One was that they enforced the covenant not to compete under Kentucky law against my clause. But secondly, it said the covenant not to compete was too vague, too expansive, and could not be equitably enforced as written. That order is not being appealed. That's the law in our case. He then said, Mr. Petter, you have the opportunity to, I'm going to craft a preliminary injunction, and we're going to look at who are the substantial business relationships that you're dealing with. Mr. Petter provided a list. I was granted five business days from receipt of that list to objectivity. The case was set for Sabbath on December 15th. It was set for. December 15th, Mr. Petter had submitted his list. Our five-day period had not yet run. I had not filed my objections. The court decided that day of the Sabbath that it was going to enter the preliminary injunction, and it did. And it adopted the entire Petter list. Because my time had not yet run, and it was beyond me that it was done on the 15th when my time hadn't run, Judge McGlynn gave me additional time to file my objections. On the 16th, I still wasn't sure what the 15th order was, the TRO, or preliminary injunction, based on language. He entered a new order. And that order said that he was granting the preliminary injunction, that I had the opportunity to file my objections, and that he would thereafter either amend, dissolve, or affirm the prior December 15th preliminary injunction order, based upon my objection, a hearing on my objections. January 14th is when we had the hearing. In the meantime, we had filed motions to basically have the court reconsider, which it denied. And we had filed our objections. On the 14th, we have a new order. In that order, again, he finds these restrictions, this covenant, is too vague. It is too expansive. Can't equitably be enforced. And I'm going to rewrite it. And basically, he adopts Petter's list minus the customers I had objected to. The court found that it was impossible to look at the covenant not to compete, and decide which cases would fall within the strike zone and which would not. That it was ambiguous. And he ruled that if decision-making was outside the Petter's mark of what's said to be five states, if decision-making was outside the five states, and it involved deliveries within the five states, that was okay. That wasn't competition. If the headquarters for the company with whom we were conducting business was outside the five states, and it resulted in business within the five states of Petter's market, that wouldn't necessarily be a violation of the covenant. Not necessarily. That was the court order. Even the order is somewhat ambiguous. But I think what the judge was saying is, look, the competition is in the five states. If we have a company that makes its decisions in Pennsylvania, which is not prohibited, and they happen to have a factory or a plant in Illinois, which is within the five-state prohibited area, then that's not going to be a violation of the sign of the peace. So when we look at the language, and I direct your attention to the language of the Prohibition. It says that Petter's covenant would prohibit us from competing with Petter within Petter's market without regard to, one, whether the competitive business has its office or other business facility within Petter's market, two, or whether any activity of my client occurs or is performed within Petter's market, or three, whether my client resigns or reports to an office within Petter's market. And then it says, for purposes of this agreement, Petter's market are these five states. Well, under that language, my client conducting business in Alaska with somebody who only deals in Alaska is an activity that occurs or doesn't occur within Petter's market, but under this one subparagraph could be prohibited. It's inconsistent. You can't look at those three subparagraphs and give them effect without vitiating the five-state Petter market. And if you say, well, it's only Petter's market those five states were worried about, then these three subparagraphs should have no meaning, obviously ambiguous. So the court saw that and attempted to craft a method of dealing with it. It blue-penciled it, which is what is permissible in Kentucky, if the court finds it necessary to fix an ambiguity or to correct a covenant which is too expansive, too broad. And there are a number of cases, and counsel, in fact, cited Cagle and Hammonds for other purposes. But both of those cases say that the court specifically has the right to amend the covenant to make it fall within equitable terms, basically. Counsel also talked about the non-solicitation provision and that he wasn't granted any relief under that. The court had ignored it. I suggested to the court that the reason that the trial court ignored the non-solicitation provisions of the covenant not to compete is it was fled. But absolutely no evidence was ever given by Mr. Petter or anybody on his behalf on that provision. If, you know, besides the Cambridge engineering case, which is basically the same situation, there was a provision in the covenant not to compete, a non-solicitation provision, that was fled, but no evidence tendered. And the court said, for purposes of this appeal, you waived that issue. You cannot have a remedy based on that theory. And why would that be? Well, was I supposed to provide? I'm going to be ambushed. Am I supposed to provide rebuttal evidence when nothing was ever put on by the plaintiff? So I don't put on any evidence. Now, this non-solicitation agreement has no geographic limitations. We certainly would have objected to the scope, the enforceability of it. But there was no point in it because nothing in the record supported that theory. And for that reason, it needs to be deemed waived. The breach of fiduciary duty issue, most – well, I can't say that Mr. Nestor misstated the testimony. But there was more testimony than that. The real testimony that went uncontroverted was Petter – or Hushcraft was the fiduciary of Petter. He was president. You can see that. He went to visit F.G. Quality in his capacity on behalf of Petter. When he gets to Petter – or excuse me, F.G. Quality, he finds out that there is a business possibility there, but it is one that absolutely would not be undertaken by Petter. And he knows that because he's president and he knows the terms of what Petter will and will not do. He takes another Petter employee with him. He's not hiding anything from Petter. He's got a co-employee of Petter with him when he meets with F.G. Quality. But what does he find? He finds that they are looking for a proprietary product, one that requires research and development, which in fact takes three years from the time he met with F.G. Quality, and that Petter would not, based on financial conditions, have undertaken anything that would require them to expend the money for research and development for three years or for any term to develop a proprietary product. It's not a product that Petter sells. It's not remotely related to any products Petter sells. Petter's CFO testifies with a long list of items that Petter sells. If he had sold this item, it would have been in the list. This is the only item that is the subject of all that's going on. So the testimony is, based on what he hears, Hutchcraft decides Petter would never take this business opportunity. It's not a corporate opportunity for Petter. They're not going to expend the research and development. There are payment terms. The payment terms that Petter has, and Hutchcraft knows better than any because he enforces them, is that products must be paid for within 30 days of receipt. This item is not going to get paid until the customer eventually pays F.G. Quality. It could be 90 days or more. So it's got payment terms that Petter, for financial reasons, would never accept. So the trial court, hearing this testimony, it's uncontroversial, and decides, and it's up to the trial court to decide, is this a breach of a fiduciary duty? And the court finds it's not a breach of a fiduciary duty. And the reason it's not a breach of fiduciary duty is obvious it wasn't a corporate opportunity that Petter would have ever dealt with, that Petter ever would have accepted. So if we have no breach of fiduciary duty, if we haven't taken an opportunity that Petter would never have, if we've taken an opportunity Petter never would have taken, then our termination could not be for cause. Because it's not based on a breach of a fiduciary duty. If it's not for cause, there's no justification for our termination. And this wraps around to the argument over is there any consideration, if we assume that there is now a covenant not to compete beyond the 2007 contract termination date, it would be under Kentucky law. And Kentucky law does differ somewhat from Illinois on covenants not to compete. Kentucky is much more prone to accept covenants not to compete than Illinois. But once they accept it, they're more critical of how they enforce it. In Illinois, it's tougher to get the covenant not to compete. They're disfavored, as you well know, in Illinois. Well, there are cases, and we cited three. The real issue before this court is whether or not when you have an employment agreement with a covenant not to compete, and it expires. And after that initial period of employment, the employer continues to employ the employee, promises continued employment. Does this promise of continued employment constitute valid consideration for a new covenant not to compete? If the employer thereafter discharges unfairly the employee, well, there's no evidence they discharge the employee fairly or for cause. The court specifically fathers no breach of fiduciary duty. We suggest to the court that the cases we cite, and counsel cited two, the third one was two years ago, the Snyder-Bolton-Sprue case. We suggest to the court that when you look at all of them, there is no law in Illinois and Kentucky that would enforce this covenant after the employer wrongfully or without cause discharges the employee, because that would, the continued promise of employment is the only consideration that could have occurred for this second covenant, if it exists at all. The record was very clear. There was no additional payment. There was no discussion of another covenant not to compete. So if there is any consideration at all, it's a promise of continued employment. And that consideration in Kentucky would fail if the employer thereafter discharges the employee without cause. So we would suggest to the court that the trial court, we have a December 6th order, finding that we have a covenant not to compete that is enforceable. We believe that's wrong, and that all those things roll into ultimately the subsequent order. We're kind of in a tricksy, and Mr. Nestor didn't appeal the December 6th order either. But we have an order in December 6th finding that the covenant is enforceable, must be based under a theory of employment agreement, because there's no breach of fiduciary duty. And this covenant is too broad, too expansive, and too vague, and has to be rewritten. And we don't know what the terms of the rewrite are going to be until January 14th, 2011. And it's only at that point that we know the effect of the earlier order. I will point out that the January 14th order says that it amends the December 6th order only to the extent that it's inconsistent. Otherwise, it remains in full force and effect. Well, it wasn't inconsistent as far as the court deciding it's too vague, it's overexpansive, too expansive, and cannot be enforced equitably. It had to be rewritten. But for those reasons, we would ask the court, one, to either find that there is no covenant, the covenant not to compete should not have been enforceable against my client at all, but if the court is not going to set that aside, that for the reasons argued, that the covenant still was enforceable, then to adopt the trial court's decision, which is to affirm it, allow him to blue pencil a covenant not to compete, which is too vague, too expansive, and could not be easily monitored. Thank you. Thank you, counsel. May it please the court, I know I have a limited amount of time to cover a lot of ground. Briefly, in an attempt to conclude my remarks, my earlier remarks, what I was indicating with regard to the covenant not to compete and Mr. Hutchcraft's interpretation of Kentucky law in that regard is that it would have the absurd result of encouraging an employee to violate or breach an employment contract so that when he would be terminated by his employer as a result of that breach, the covenant not to compete would be unenforceable. It doesn't make sense. Kentucky, by the way, in its appellate court opinions, doesn't state that as a proposition of law. That's Hutchcraft's interpretation or application of Kentucky law to this case, which again, reaches an absurd result. Second point in that same regard with regard to the covenant not to compete, Hutchcraft did not appeal the December 6th order. This court, based upon a motion to dismiss the notice of appeal, dismissed that appeal with regard to the December 6th order. It was the December 6th order that found that there was consideration, appropriate consideration, for the covenant not to compete. Therefore, it is our position, your honor, that is to say my client's position, that the issue with regard to consideration, whether there was or was not consideration for the covenant not to compete, is not before this court because Hutchcraft failed to timely violate notice of appeal in that regard. And so that the court should not even reach that issue or address that issue in its decision or termination of this case. With regard to the issue of the non-solicitation provision and the intention that my client waive that issue, I, again, quite properly don't understand the issue that's being raised. What transpired at the hearings that we had, both non-evidentiary and evidentiary, is that various issues were argued and evidence presented. I would liken this to a personal injury case where there's multiple counts, one for negligence, the other for strict liability, or another one for breach of warranty. All the evidence comes in and applies to all those various theories. For Hutchcraft to say, well, the evidence only came in as to the non-competition provision of the not-to-compete document and not the non-solicitation provision of the not-to-compete document doesn't make sense. The evidence came in. The evidence was presented to the court. The court was aware of the evidence of the arguments of counsel. There cannot be any bifurcation here that, oh, the evidence only pertained to the non-competition provision but did not apply to the non-solicitation provision. That did not happen and cannot happen, as I understand it, under rules of civil procedure. With regard to the other points that were made with regard to his attempt to avoid the non-competition provision, we have stated in our briefs, as a result of an opinion issued in the case of Kerrigan v. Unity Savings Association, and I quote, a fiduciary's own judgment as to whether a company could or would take advantage of an opportunity cannot operate as a substitute for a defendant's duty to present the question to the company for its independent evaluation. So the fiduciary has that obligation. The fiduciary independently cannot say, oh, I don't believe that my master, my employer, would want this business opportunity. Therefore, I'm going to keep it for myself. That is not a viable option. The second point that Kerrigan makes is with regard to whether the items are similar or dissimilar in terms of the subject matter of the contract. In the Kerrigan case, the court found that the sale of homeowners insurance was reasonably incidental to the business of a savings and loan association, even though the savings and loan association had never actually sold such insurance. So the scope or the parameters in that regard are broad and certainly encompass the facts of this case. The point that I didn't make or have an opportunity to make earlier was this. What initiative has been created by Judge McGlynn's orders? First, he found that he was not going to enforce the request for preliminary interruption. Then he enforced it. Then he enforced it with exceptions. The exceptions swallow the rule. We're in Mount Vernon. Continental Tire is in Mount Vernon. Under Judge McGlynn's current standing order, the covenant not to compete, the breach of fiduciary duty, and the request for preliminary injunction do not apply to business conducted in Mount Vernon. Certainly, it's within the five-state area. And certainly, it should be accomplished in the court's heart, but it was not. Thank you. Gentlemen, thank you. That calls for your briefs. We'll take them at our advisement.